FILED Rec'd 11/14/11 PF
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ NOV 14 2011 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X

THEODORE W. LAWLER,

                Plaintiff,

-against-

MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.
---------------------------------------------------------------- X

10-cv-3397 (ARR)

NOT FOR PUBLICATION

OPINION & ORDER

ROSS, United States District Judge:

Plaintiff, Theodore Lawler, commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3). Plaintiff seeks judicial review of the decision of the Commissioner of Social Security (the "Commissioner") that he was not disabled under the Act for the purposes of receiving Disability Insurance Benefits ("DIB"). Now before the court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons explained below, the court denies the Commissioner's motion, grants plaintiff's motion insofar as it seeks reversal of the Commissioner's decision, and remands the case for further proceedings.

## I.    BACKGROUND[1]

Plaintiff applied for disability benefits on April 24, 2007 alleging disability based on post-traumatic stress disorder (PTSD), anxiety, depression and bilateral sensorineural hearing loss, with an onset date of June 30, 2006. Complaint ("Compl.") a ¶ 4. Following a January 15,

---

[1] Because the parties do not dispute the ALJ's fact-finding with respect to plaintiff's bilateral hearing loss, the court limits its scope of review to the portions of the administrative record regarding plaintiff's mental health diagnoses and related disability.

1

2009 hearing at which plaintiff appeared pro se, R. 29-46,[2] Administrative Law Judge Mark Solomon (the "ALJ") issued a decision, dated November 10, 2009, finding that plaintiff was not disabled under the Act. The Appeals Council denied plaintiff's request for review on May 27, 2010, making the ALJ's decision the final decision of the Commissioner on that date. R. 1-4.

Plaintiff, fifty-eight years old at the time of his hearing, is a high school graduate who worked as a unionized carpenter on commercial buildings for twenty-six years. R. 109. At his hearing, plaintiff testified that around June 30, 2006, he stopped working because, "I wasn't getting along with a lot of people and I was getting a bad reputation like I was losing control of I guess my nerves, you know." R. 13-28. When pressed further by the ALJ, plaintiff acknowledged that at the time there was a seasonal slowdown of available work, but that he did not return because (1) he was advised to "take it easy" by his doctors and (2) he learned that he had been awarded total unemployability benefits by the Department of Veteran's Affairs ("VA") and was no longer permitted to work. R. 36-37. Plaintiff explained that even if he had not been awarded benefits and advised that he could no longer work, he would not have returned to work because he feared that lapses in concentration might cause injury. R. 37. Plaintiff also explained that he could no longer work due to his PTSD and not due to any physical limitations. R. 37-38. Plaintiff's relevant medical history, insofar as it is included in the administrative record, is laid forth below.

A. Administrative Record Prior to ALJ's November 10, 2009 Decision

On July 7, 2005, plaintiff presented to the Veteran's Affairs New York Harbor Health Care System (NYHHCS) for screening for the Agent Orange Registry. R. 165. In addition to being screened for Agent Orange exposure, plaintiff complained about hearing loss and flashbacks to his combat experience in Vietnam. Plaintiff had served in the Army from 1969 to

---

[2] Citations to "R. __" refer to the certified administrative record.

1971, and from April 1970 to December 1971 with the Infantry in Vietnam as a "tunnel rat" in Danang, Hue and Phu Bai. R. 160. Dr. John Abrica, a general practitioner, diagnosed plaintiff with depression, PTSD, hypercholesterolemia and exposure to Agent Orange. R. 165-66. On the same day, plaintiff saw Dr. Robert Katz, a clinical psychologist, who noted that plaintiff had a "cluster of symptoms suggesting PTSD" and recommended further evaluation. R. 169.

On May 2, 2006, Dr. Wayne Ayers, Ph.D., plaintiff's treating physician, conducted an initial PTSD evaluation of plaintiff. Plaintiff reported chronic symptoms of varying intensity that began after he returned from Vietnam and had become "more frequent and intense since 9/11" and the most recent war in Iraq. R. 153-54. Because of his experience searching the tunnels in Vietnam, plaintiff had developed a fear of "dark and [] small cramped spaces." R. 154. Plaintiff reported seeing men shot and killed and "Med-Evac'd" out. Id. Plaintiff complained that "his biggest problem has been his temper," which got him into trouble at work, and strained his relationship with his wife. Id. Plaintiff recalled getting into six car accidents in the late 1990s, which Dr. Ayers noted in "retrospect seem[] like para suicidal acts." Id. Plaintiff also reported depression, difficulty sleeping, intolerance of small or dark spaces and a fear of crowds. Id. Dr. Ayers noted that plaintiff spends most of his time alone on walks and fishing, has veteran friends he sees about once a week, could communicate adequately and his thoughts were "logical and directed." R. 155-56. Dr. Ayers reported no evidence of delusions or hallucinations. R. 156. Dr. Ayers, however, found that plaintiff made "poor eye contact" was "somewhat poorly related" and got "lost in his own thoughts." Id. Dr. Ayers also observed that plaintiff had "passive suicidal ideation without plan or intent," was "somewhat distracted at times," and exhibited "obsessive thinking" about his experiences in Vietnam. Id. Dr. Ayers opined that plaintiff exhibited "DSM IV Criteria for PTSD," reporting "severe symptoms of

3

PTSD including recurrent and stressing recollections of his military combat experience, persistent avoidance of stimuli associated with his combat trauma, and numbing of general responsiveness," as evidenced by "efforts to avoid thoughts and diminished interest in any significant activities in his life, his feeling of detachment and estrangement from others, and marked limited range of affect, his sense of foreshortened sense of future, his persistent symptoms of increased arousal as evidenced by difficulty falling asleep, his outburst and irritability, difficulty concentrating, [and] his hypervigilance in public and social situations." Id. Dr. Ayers diagnosed plaintiff with a GAF score of 50,[3] noting that his PTSD has "significantly negatively impacted [] his family role functioning, employment history, [and] physical health . . . [and] [i]t is likely that this veteran's chronic underemployment and inability to flourish in his personal relationships are a direct result of his PTSD diagnosis." R. 157.

On February 8, 2007, plaintiff returned to Dr. Ayers who reported the persistence of plaintiff's mental health problems, including: nightly interrupted sleep, chronic anger on the job, and difficulty socializing. R. 309. In his mental status examination, Dr. Ayers noted that although plaintiff was able to communicate his ideas adequately, his thoughts were logical and directed, and there was no evidence of delusions or hallucinations, plaintiff maintained poor eye contact, was somewhat poorly related, got lost in his own thoughts, exhibited passive suicidal ideations without plan or intent and appeared somewhat distracted. R. 310. Dr. Ayers once again diagnosed plaintiff with PTSD and a GAF score of 50, and referred plaintiff for individual therapy and medical evaluation. Id.

---

[3] A GAF score between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or a serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep job). Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th Ed. 1994).

On February 12, 2007, plaintiff saw Dr. Masood Mirza, a VA psychiatrist, also plaintiff's treating physician, who noted that plaintiff complained of depression, anxiety, nightmares and had difficulty interacting in social and work-related interactions. R. 173. Dr. Mirza concluded that plaintiff was "not capable [of] working because of PTSD symptoms of anxiety, depression and fear." Id. Dr. Mirza diagnosed plaintiff with chronic PTSD, "stressor from constant anxiety" and a GAF score of 40.[4] Plaintiff then saw Dr. Mirza for a follow-up appointment on June 25, 2007. Dr. Mirza noted that plaintiff was now taking Bupropion, for depression, and Temazepam, for insomnia. R. 245. Dr. Mirza's mental status examination noted that plaintiff's speech was brief with a slow, low tone, but that plaintiff had no looseness of association, delusions or hallucinations, and exhibited clear thinking. Id. Dr. Mirza, however, also found that plaintiff was "sad with feelings of hopelessness and worthlessness," and his "affect [was] depressed." Id. Dr. Mirza concluded that plaintiff was "totally disabled because of his persistent anxiety, depression and inability to interact with people. He has [a] problem trusting people since return from Vietnam." Id. Dr. Mirza recommended that plaintiff resume sessions with Dr. Ayers to for individual and group therapy. Id.

On December 26, 2007, the VA notified plaintiff via letter that he was entitled to individual unemployability benefits at the full 100% coverage. R. 248. The VA decision specified its finding that plaintiff's PTSD was 70% disabling and his tinnitus was 10% disabling. Despite his individual disabilities being rated at a total of 80%, the VA made a determination of individual unemployability. Id.[5]

---

[4] A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant), or major impairment in several areas, such as work or school, family relations judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th Ed. 1994).

[5] Under the VA benefits framework for service-connected disability, a veteran may be entitled to 100% coverage even if a veteran's disabilities do not qualify for a 100% rating under the rating schedule. If a claimant has two or

5

On August 24, 2007, plaintiff received a consultative examination from Dr. Sudharam Idupuganti. Dr. Idupuganti noted that plaintiff complained of "insomnia, anxiety, nightmares and suspiciousness," and had been diagnosed with PTSD by the VA hospital. R. 206. Dr. Idupuganti observed that plaintiff related well, did not appear to be sad, exhibited logical and clear thoughts, denied any hallucinations or suicidal ideations, was fully oriented, had good memory, concentration, average intellectual skills, good insight and social judgment skills. R. 208-09. Dr. Idupuganti's diagnosis stated that plaintiff's PTSD was "in remission" after receiving treatment at the VA, that plaintiff no longer exhibited sustained depression, and that plaintiff exhibited no indication of any other psychiatric illness. R. 210. On October 10, 2007, a non-examining State agency psychiatrist, Dr. E. Gagan, reviewed the evidence on file and found that plaintiff's limitations appeared to be moderate in the area of attention, concentration and interaction, and that plaintiff was able to "understand, remember and carry out simple instructions, maintain conc[entration], pace and persistence; interact and adapt." R. 233.

On October 30, 2008,[6] plaintiff returned to see Dr. Mirza, who noted plaintiff's history of PTSD and that plaintiff complained of being under great stress since moving in with his girlfriend. R. 384. Dr. Mirza reported that plaintiff's mental status appeared stable and that he had no evidence of a thought disorder or suicidal ideations. R. 385. Dr. Mirza, however, noted that plaintiff's mood was depressed; he had sleep problems, nightmares and was startled by any

---

more service-connected disabilities—in this case tinnitus and PTSD—at least one of the disabilities must be rated at 40% or higher, the combined disability rating must be 70% or higher, and the VA must find the veteran "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16(a). In this case, plaintiff had a 70% rating for his PTSD, 10% for tinnitus, a combined rating of 80%, and the VA determined that he was unemployable.

[6] This report was not before the ALJ prior to his decision, but was submitted as new evidence to the Appeals Council, after plaintiff retained counsel. See Pl. Mem. of Law in Support of Pl's Cross-Motion for Judgment on the Pleadings ("Pl. Mem.") at 4; Def. Mem. of Law in Support of Def's Mot. for Summary Judgment on the Pleadings ("Def. Mem.") at 17. The Appeals Council's denial of plaintiff's claim, however, R. 1-4, provided no basis for its decision and no decision by the Commissioner has addressed this evidence in the record.

loud noises. R. 385. Notwithstanding Dr. Idupanti's observations from 2007, Dr. Mirza once again diagnosed plaintiff with PTSD. Id.

Just before his hearing before the ALJ, plaintiff saw Dr. Ayers on January 12, 2009 for individual supportive therapy for his PTSD. Plaintiff complained of anxiety and stress, particularly given the recent death of his brother and his sister's upcoming major surgery. R. 288. Plaintiff declined further individual or group therapy. Id. On July 23, 2009, plaintiff returned to Dr. Ayers for supportive therapy and complained of being "stressed, overwhelmed and sad" and that he had been drinking two six-packs of beer a night. R. 276. Dr. Ayers noted that plaintiff's mother had died a month earlier and plaintiff was "anxious and depressed." In a follow-up visit a week later, Dr. Ayers observed that plaintiff was more relaxed, had been getting along better with his girlfriend, and had stopped drinking for the moment. Id.

On August 25, 2009, plaintiff returned to Dr. Mirza who noted only that plaintiff's last visit was in October 2008 and that he had failed since to return to the clinic.[7] R. 438.

B. Administrative Record Post-Dating the ALJ's Decision

Following the ALJ decision denying plaintiff benefits, plaintiff visited Dr. Mirza again on December 15, 2009.[8] Plaintiff complained of "intense stress" due to his recollection of Vietnam, recurring nightmares, difficulty sleeping, fear and anxiety, and memories of his sergeant's death. R. 437. Dr. Mirza found no evidence of "gross thought disorder," found plaintiff oriented, his memory intact and no suicidal or homicidal ideation, but that his mood was "sad and depressed." Id. Dr. Mirza diagnosed plaintiff—once again—with chronic PTSD as evidenced by "nightmares[,] intrusive memories during the day[,] social withdraw[a]l[, and] feeling easily startled," and recommended "medication management." R. 437-38.

---

[7] This report was also not considered by the ALJ but was sent to the Appeals Council after plaintiff retained counsel.
[8] Defendant inaccurately states that plaintiff had not visited Dr. Mirza since October 2008. Prior to the ALJ's decision, plaintiff had gone for PTSD supportive treatment on August 25, 2009.

7

On December 28, 2009 plaintiff met with Dr. Ayers for individual supportive therapy for PTSD. R. 436. Dr. Ayers noted that plaintiff was anxious, complained about his relationship with his girlfriend and family, had been drinking more frequently, and was having nightmares and intrusive thoughts during the day about his time in Vietnam. Plaintiff expressed interest in individual therapy and was advised to return in a month. Id.

C. The ALJ's Decision

In his opinion dated November 10, 2009, the ALJ denied plaintiff's application for disability on step five of the five-step sequential evaluation process for determining whether a claimant is disabled. The ALJ found that plaintiff had severe impairments of bilateral sensorineural hearing loss and PTSD but found plaintiff's allegations of disabling mental limitations were unsupported by the record. R. 20. The ALJ found that plaintiff's nonexertional limitations "ha[ve] little to no effect on the occupational base of unskilled work at all exertional levels," and using the Medical-Vocational Guidelines (the "grid"), found plaintiff not disabled. R. 24.

The ALJ acknowledged the diagnoses in 2006 and 2007 that plaintiff suffered from PTSD by treating physicians Dr. Ayers and Dr. Mirza. However, the ALJ found compelling the determination of one-time consultative examiner, Dr. Idupuganti, that plaintiff's PTSD had gone into remission following VA treatment and that plaintiff suffered from no other psychiatric conditions. The ALJ determined that Dr. Idupuganti's diagnosis was confirmed by plaintiff's contemporaneous records from treating physicians, his failure to seek treatment for his psychiatric conditions, and his regular active behavior, such as his frequent walks, trips to the gym, interactions with family and other veterans. R. 21-22. The ALJ also noted that plaintiff's significant earnings in the years immediately before the onset date in June 2006 contradicted his

8

claim that his mental health had severely impacted his ability to work. Id. The ALJ attributed particular significance to the fact that "[a]lthough [plaintiff] stated in testimony that he receives monthly psychological and psychiatric treatment, the treating records show that he only received sporadic treatment" and that "the only complaints of severe PTSD symptoms in the record appear in the 2006 treating notes." R. 22.

Finally, while the ALJ stated that he gave "significant weight" to Dr. Mirza's diagnosis that plaintiff had PTSD, he rejected Dr. Mirza's conclusion that plaintiff was unable to work because the conclusion was "based largely on the claimant's self report and is not supported by objective findings." R.23. "More importantly," the ALJ gave "greater weight" to Dr. Idupuganti's opinion because Dr. Mirza's diagnosis "refer[red] to the claimant's condition during a brief, transient period of exacerbation of his PTSD symptoms, and subsequent evidence convincingly shows that the claimant's symptoms went into remission." R. 23.

## II. DISCUSSION

A. Standard of Review

In order to establish disability under the Act, a claimant must prove that (1) he is unable to engage in substantial gainful activity by reason of a physical or mental impairment expected to result in death or that had lasted or could be expected to last for a continuous period of at least twelve months; and (2) the existence of such impairment was demonstrated by medically acceptable clinical and laboratory techniques. 42 U.S.C. §§ 423(d), 1382(a); see also Shin v. Apfel, 1998 WL 788780 at *5 (S.D.N.Y. November 12, 1998) (citing cases).

The SSA has promulgated a five-step process for evaluating disability claims. See 20 C.F.R. § 404.1520. The Second Circuit has characterized this procedure as follows:

"First, the [Commissioner] considers whether the claimant is currently engaged in

> substantial gainful employment. If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)) (brackets and alteration in original). The plaintiff has the burden of establishing disability on the first four steps of this analysis. On the fifth step, however, the burden shifts to the Commissioner. See Bluvband v. Heckler, 730 F.2d 886, 891 (2d Cir. 1984).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted). "Substantial evidence" is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted). An evaluation of the "substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld. See Tejada v. Apfel, 167 F.3d 770, 773-74 (2d Cir. 1999). Accordingly, the reviewing court may not "substitute its own judgment for that of the ALJ, even if it might have reached a different result upon a de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).

In assessing the evidence, the opinion of a treating physician is to be given controlling weight if it is well supported by medical findings and it is not inconsistent with other substantial evidence. Clark v. Comm'r of Soc. Sec.,143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). Where the ALJ does not give the treating physician's opinion controlling weight, he is required to provide "good reasons" for this decision. Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Moreover, an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). When a treating physician's opinion "is not adequately supported by clinical findings, the ALJ must attempt, sua sponte, to develop the record further by contacting the treating physician to determine whether the required information is available." Cleveland v. Apfel, 99 F. Supp. 2d 374, 380 (S.D.N.Y. 2000) (citing to 20 C.F.R. § 404.1512(e)). Although the ALJ must develop the record whether or not a claimant is represented by counsel, "[w]hen a claimant properly waives his right to counsel and proceeds pro se, the ALJ's duties are 'heightened.'" Moran v. Astrue, 569 F.3d 108, 113 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990)). In particular, the ALJ must make every reasonable effort to help an applicant retrieve reports from his medical sources, 20 C.F.R. §§ 404.1512(d), 416.912(d), and must seek additional evidence or clarification when the "report from claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

B. <u>The ALJ's Failure to Develop the Record and to Apply the Correct Legal Standards</u>

In this case, the ALJ did not fulfill his obligation to develop the record or give the treating physicians' opinions controlling weight.

The ALJ relied critically on the determination of the non-treating examiner, Dr. Idupuganti, in August of 2007 that plaintiff's PTSD was "in remission." However, by the time of the decision in November 2009, more than two years had passed since the creation of any medical record before the ALJ by plaintiff's treating mental health professionals. See Calzada v. Astrue, 253 F. Supp.2d 250, 274 (S.D.N.Y. 2010) (finding that ALJ failed to develop the record and remanding where two years had passed since assessments reflected in the record were made). An ALJ's affirmative obligation to develop the record also includes the obligation to contact a claimant's treating physicians and obtain their opinions regarding the claimant's residual functional capacity. LoRusso v. Astrue, No. 08-CV-3467, 2010 U.S. Dist. LEXIS 33487, at *21 (E.D.N.Y. March 31, 2010). "Thus, when the claimant appears pro se, the combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature and the severity of the claimed disability." Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991).

Had the ALJ conducted a more searching review of the records in existence—in addition to seeking out updated medical opinions— he would have uncovered Dr. Mirza's notes from the October, 30, 2008 evaluation, in which Dr. Mirza once again diagnosed plaintiff with PTSD, noting depression, sleep problems, nightmare and an exaggerated startle response. R. 385. These findings closely resemble Dr. Mirza's findings in February 2007, which the ALJ attributed to a "brief, transient period of exacerbation of his PTSD symptoms," before "subsequent

evidence convincingly show[ed] that the claimant's symptoms went into remission." R. 23. Dr. Mirza's October 30, 2008 report therefore directly conflicts with the ALJ's findings of fact and the consultative examiner's diagnosis to which the ALJ gave controlling weight. Moreover, had the ALJ obtained updated opinions of the treating physicians, he would have revealed reports like those offered to the Appeals Council, after the ALJ's decision in November 2009 and only after plaintiff retained counsel, that also diagnosed plaintiff with PTSD, and further rebutted Dr. Idupuganti's opinion that plaintiff's PTSD had been in remission since 2007.[9] By failing to properly develop the record, the ALJ did not fulfill his obligation to address all the pertinent evidence and to give appropriate weight to the treating physician's diagnosis, and therefore to adequately explain his reasoning. See, e.g., Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir.1998); Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir.1984). The ALJ's failure to consider this evidence was particularly problematic in this case, where plaintiff's lack of mental health treatment records formed a substantial basis of the ALJ's determination that plaintiff was not disabled.

Moreover, the ALJ's rationale for attributing controlling weight to the opinion of the consultative examiner, Dr. Idupugandi, instead of plaintiff's treating physician, Dr. Mirza, is circular. According to the opinion, ALJ gave more weight to Dr. Idupugandi's opinion principally because Dr. Mirza's diagnosis occurred "during the brief, transient period of exacerbation of his PTSD symptoms, and subsequent evidence convincingly shows that the claimant's symptoms went into remission."[10] R. 23. Notwithstanding, as noted above, that the

---

[9] Dr. Mirza's December 15, 2009 findings, for instance, confirmed his prior diagnosis and squarely contradicted the consultative examiner's opinion that plaintiff's PTSD was merely fleeting or was in remission.

[10] The Court assumes that the ALJ's rationale for giving no weight to Dr. Ayers' opinion was the same as the rationale for discounting Dr. Mirza's opinion; though the ALJ failed to address what weight, if any, he accorded to Dr. Ayers' conclusions. Dr. Ayers diagnosed plaintiff with severe PTSD symptoms in 2007 on two separate occasions and noted that it "significantly negatively impacted [] his family role functioning, employment history, [and] physical health . . . [and] [i]t is likely that this veteran's chronic underemployment and inability to flourish in

medical records from 2008 and 2009 not considered by the ALJ demonstrate that plaintiff in fact did continue to suffer from PTSD, the ALJ's determination that plaintiff's symptoms were in remission appears to be based significantly, if not entirely, on Dr. Idupuganti's one-time examination findings. No medical evidence in the record, aside from Dr. Idupuganti's report, suggests that plaintiff's PTSD went into remission after Dr. Mirza's and Dr. Ayers' earlier diagnoses. The ALJ must give "good reasons" for failing to give the opinion of the treating physician "controlling weight" and adopting a contradictory opinion. Halloran, 362 F.3d at 32; Snell, 177 F.3d at 133. That the one-time consultative examiner simply disagreed with the treating physicians does not provide a good enough reason for rejecting the treating physicians' conclusions.

The ALJ also failed to state what weight, if any, he gave to the VA's disability determination when making his ruling. While some courts have required that VA disability rating determinations be given "great weight" in the commissioner's decisions,[11] the Second Circuit has held that a VA's determination "is entitled to some weight and should be considered." Hankerson v. Harris, 636 F.2d 893, 896-97 (2d Cir. 1980). Here, the ALJ acknowledged the VA disability rating of plaintiff 70% for PTSD and moved on to the medical records to conclude "that the condition is not so limiting as to warrant a finding of disability within the meaning of the Social Security Act." R. 21.

As an initial matter, the ALJ, while acknowledging the disability rating of 70%, failed to acknowledge the VA's determination in December 2007 that plaintiff was entitled to 100% disability benefits due to "individual unemployability." R. 248. The VA guidelines entitle a claimant to 100% disability rating even where his or her ailments are rated below 100%, if the

---

his personal relationships are a direct result of his PTSD diagnosis." R. 157.
[11] See, e.g., MccArtey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002); Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001).

14

VA finds that the claimant is "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16(a). Such a finding, though not binding, should at least be considered by an ALJ determining whether plaintiff is capable of engaging in "substantial gainful activity," a similar inquiry. Accordingly, the ALJ erred by failing to acknowledge, and therefore properly weigh, the VA's determination that plaintiff was "unable to secure or follow a substantially gainful occupation." See Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *22 (S.D.N.Y. Jan. 7, 2009) ("Courts in this Circuit have long held that an ALJ's failure to acknowledge relevant evidence or explain its implicit rejection is plain error.") (internal quotation omitted).

Moreover, while the ALJ did acknowledge the VA's 70% service-connected disability rating for PTSD, the opinion fails to indicate that he attributed any weight to it. The Commissioner cannot avoid remand by pointing out that the ALJ acknowledged the VA disability rating and considered the evidence upon which the VA determination was based. See Machia v. Astrue, 670 F. Supp.2d 325, 336 (D.Vt. 2009). Indeed, the ALJ did review many of the medical reports before the VA. The Second Circuit, however, requires that the VA's rating be given "some weight." Hankerson, 636 F.2d at 897 (emphasis added). It follows that the VA's disability determination be accorded some actual weight, independent of and in addition to, the evidence in the record itself. Machia, 670 F. Supp. 2d at 336. An ALJ, however, fails to give any weight to the VA's determination by merely reexamining the evidence and coming to a different conclusion. Here, the ALJ failed to acknowledge what weight, if any, he gave to the VA's disability rating.

Finally, the ALJ's errors in failing to develop plaintiff's mental health record, failing to accord the treating physicians the proper weight, and failing to give weight to the VA's disability

15

determination, are particularly important to the determination of whether plaintiff is disabled in this case. In his decision, the ALJ reached the fifth step of the SSA's five-step, sequential evaluation process for evaluating disability claims. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At that step, the Commissioner bears the burden of proof to show that plaintiff is able to engage in other gainful employment in the national economy. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "In the ordinary case," the Commissioner may meet his burden by resorting to the Medical-Vocational Guidelines, or "grids." Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). The grids take into account a claimant's residual functional capacity, in conjunction with his age, education and work experience, and indicate whether the claimant can engage in any substantial gainful work existing in the national economy. Rosa, 168 F.3d at 77. Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments "significantly limit the range of work permitted by his exertional limitations." Bapp, 802 F. 2d at 605. "In these circumstances, the Commissioner must 'introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" Rosa, 168 F.3d at 78 (quoting Bapp, 802 F. 603); see SSR 96-9p ("Where there is more than a slight impact on the individual's ability to perform the full range of sedentary work, if the adjudicator finds that the individual is able to do other work, the adjudicator must cite examples of occupations or jobs the individual can do and prove a statement of the incidence of such work in the region where the individual resides or in several regional of the country."). In this case, the ALJ relied on the grids to determine that plaintiff was not disabled. R. 24 (citing 20 C.F. R. Pt. 404, Subtpt. P, App. 2). With respect to plaintiff's nonexertional limitations, including his diagnosis of PTSD, the ALJ found that "the additional limitations have little or no effect on the occupational base of unskilled work at all exertional levels." R.24. The ALJ did not consult a

vocational expert before he reached this conclusion, nor did he cite examples of jobs that plaintiff could perform. Whether the ALJ was required to do so depends on a proper assessment of plaintiff's mental impairments based on a fully developed record. Accordingly, having properly weighed the opinion of the treating physicians, the VA's disability determination, and having reviewed a fully developed record upon remand, the ALJ should reconsider whether use of a vocational expert is required.

Accordingly, the ALJ failed to apply the correct legal standards when he failed to give the proper weight to the opinions of treating physicians and the VA's disability determination. Insofar as the ALJ did not give weight to the opinions of plaintiff's treating physicians because they were not before the ALJ at the time of the hearing, the ALJ had an affirmative duty to develop the record. Where "there are gaps in the administrative record, or the ALJ has applied an improper legal standard," remand is the appropriate remedy to permit additional consideration. Pratts v. Chater, 94 F.3d at 39.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is denied, the Commissioner's decision denying plaintiff DIB is vacated, and the case is remanded for further administrative proceedings. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/Signed by Judge Ross/

_____
Allyne R. Ross
United States District Judge

Dated: November 14, 2011
Brooklyn, New York